## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| CHRISTOPHER DUNCAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09CV00042 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF | ) | By: James P. Jones |
| SOCIAL SECURITY, | ) | Chief United States District Judge |
| | ) | |
| Defendant. | ) | |

*Ginger J. Largen, Morefield & Largen PLC, Abingdon, Virginia, for plaintiff; and Andrew C. Lynch, Office of General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for defendant.*

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

### I. Background and Standard of Review

The plaintiff, Christopher Duncan, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Duncan protectively filed his applications for DIB and SSI on May 2, 2006, alleging disability as of April 12, 2006, (Record, ("R."), at 73-77, 570-72), due to injuries resulting from a jeep accident that caused road rash, a fractured pelvis, left hip and tailbone and damage to his left foot. (R. at 84.) The claims were denied initially and upon reconsideration. (R. at 61-62, 573-74.) Duncan then requested a hearing before an administrative law judge, ("ALJ"). (R. at 72.) A hearing was held on March 19, 2008, at which Duncan testified and was represented by counsel. (R. at 33-60.)

By decision dated April 15, 2008, the ALJ denied Duncan's claims. (R. at 16-30.) The ALJ found that Duncan met the insured status requirements of the Act through March 31, 2010. (R. at 18.) The ALJ also found that Duncan had not engaged in substantial gainful activity since April 12, 2006, the alleged onset of disability date. (R. at 18.) The ALJ determined that the medical evidence established that Duncan suffered from severe impairments, namely status post anterior superior

iliac spine, ("ASIS"), fracture of the left pelvic rim, sacral fracture and depression. (R. at 18.) However, he found that Duncan did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) The ALJ found that Duncan retained the residual functional capacity to perform sedentary work,[1] i.e., work generally performed sitting that does not require lifting in excess of 10 pounds. (R. at 25.) The ALJ specifically noted Duncan's back pain, leg pain, left arm pain, headaches and depression, and explained that Duncan took medication that could impact his ability to stay on task and could cause drowsiness. (R. at 25.) That said, the ALJ found that "[a]ny combination of these would cause moderate reduction in concentration, occur more often than mild, several times an hour[], 2 or 3 seconds in which he would reflect on one of these problems, but would not cause abandonment of task and he could continue on and complete a full workday." (R. at 25.) As such, the ALJ determined that Duncan was unable to perform his past relevant work. (R. at 28.) Based on Duncan's age, education, work experience and residual functional capacity, the ALJ found that there were jobs existing in significant numbers in the national economy that Duncan could perform, including jobs as an order clerk, a charge account clerk and an office clerk/addresser. (R. at 28-29.) Thus, the ALJ concluded that Duncan was not under a disability as defined in the Act and was not entitled to benefits. (R. at 29-30.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2009).

After the ALJ issued his decision, Duncan pursued his administrative appeals

---

[1]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2009).

and sought review of the ALJ's decision. (R. at 11.) However, the Appeals Council denied his request for review. (R. at 6-10.) Duncan then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2009). This case is now before the court on Duncan's motion for summary judgment, filed October 19, 2009, and on the Commissioner's motion for summary judgment, filed November 12, 2009.

## II. Facts

Duncan was born in 1977, (R. at 73, 570), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). According to the record, Duncan has a high school education, attended special education classes while in high school and he completed vocational training in masonry. (R. at 90.) Duncan has past relevant work experience as a construction laborer, cutting machine operator at a sewing factory, factory laborer, assembly line worker and laborer at a wood factory. (R. at 85, 107.)

At the hearing before the ALJ on March 19, 2008, Duncan testified that he was able to adequately read and write. (R. at 37.) He testified that he experienced difficulty sleeping due to pain. (R. at 38.) Duncan indicated that he required help bathing and dressing each morning. (R. at 38.) He stated that he was constantly stiff and was unable to move good, explaining that he was unable to bend over. (R. at 38.) Duncan testified that his girlfriend prepared his meals, shopped for food and performed all housework and outside work. (R. at 38-39.) He also testified that his girlfriend provided financial support. (R. at 39.) Duncan indicated that he spent the majority of his day lying around in pain watching television. (R. at 39.) He stated

that he did not get out of his house often to visit family and friends. (R. at 39-40.) Duncan testified that during typical work hours, he rarely moved, estimating that he spent seven hours per day lying and watching television. (R. at 40.)

Duncan testified that he had experienced left arm pain, explaining that the pain radiated into the middle of his shoulder blades. (R. at 45.) He also referenced his back problems, noting that he had problems with his entire spine. (R. at 45.) He stated that the pain was a pounding-type pain, and he commented that he suffered from occasional back spasms. (R. at 45.) Duncan noted that his pain had caused a decrease in his range of motion. (R. at 45.) He testified that he experienced back pain daily and that it lasted all day long. (R. at 46.) Duncan also stated that he suffered from pain in his legs, indicating that it was mainly his left leg. (R. at 46.) He testified that the leg pain typically lasted all day. (R. at 48.) He then described his back pain as sharp and acknowledged that moving around made his condition worse. (R. at 46.) Duncan reported that his physician planned to perform an epidural injection to treat his pain. (R. at 47.) He also stated that he had used a cane to assist with ambulation and that he took Ultram to treat his pain, but explained that the medication did not help. (R. at 47.)

Duncan was again asked about his leg pain, and he reported leg numbness and weakness, which had caused him to fall. (R. at 48.) He also testified that he experienced numbness and swelling in his left foot. (R. at 48-49.) Duncan stated that his left arm pain extended from his shoulder into his fingers, causing numbness in his left hand. (R. at 49.) He indicated that it was difficult for him to lift his left arm over his shoulder. (R. at 49.) Duncan also reported problems with headaches, which he attributed to his back pain. (R. at 50.) He testified that he could not hear good and

that he suffered from depression. (R. at 51.) He said that he had more bad days than good days, which caused sadness. (R. at 51.)

When questioned by his counsel, Duncan agreed that he had no problems until he was hit by the vehicle in April 2006. (R. at 52.) He acknowledged that the accident caused back, left leg and left arm injuries. (R. at 52.) Duncan further agreed that following the accident he was diagnosed with reflex sympathetic dystrophy and was referred to the University of Virginia, ("UVA"), for treatment. (R. at 52.) Duncan indicated that he was referred to UVA because he did not have health insurance. (R. at 52.) During this course of treatment, he was given epidural steroid injections and stellate ganglion blocks in an attempt to address the reflex sympathetic dystrophy, which, in Duncan's case, meant that the left side of his body was cooler than the right side of his body. (R. at 53.) He stated that the treatment did not lead to improvement, prompting the medical professionals to advise him to seek care from a local doctor. (R. at 52.) However, according to Duncan, he had difficulty finding a local doctor due to his lack of insurance. (R. at 53.) Duncan testified that the pain was constant, noting that he had not been pain free since April 12, 2006, the date of the accident. (R. at 53.) He stated that moving around, such as bending or stooping, caused his pain to worsen. (R. at 53-54.)

James Williams, a vocational expert, also was present and testified at the hearing. (R. at 54-60.) The ALJ asked Williams to assume a hypothetical individual who had the capacity to perform at the level identified in Exhibit 18F.[2] (R. at 55.)

_____

[2]Exhibit 18F contains a consultative examination dated July 2, 2007, which was completed by Dr. William Humphries, M.D. (R. at 451-63.)

The ALJ further instructed Williams to assume that the individual suffered from pain in his back that radiated into his leg, left arm and hand pain, headaches and depression. (R. at 55.) The ALJ noted that the individual would have to take medication that could impact his ability to stay on task and cause drowsiness. (R. at 55.) The ALJ told Williams to assume that any combination of the above-mentioned impairments would cause mild restrictions and to assume that the individual would need to rest over breaks and lunch. (R. at 55-56.) Williams indicated that such an individual would be able to perform work at the sedentary level, including work as an order clerk, a charge account clerk and an office clerk addressor. (R. at 56.)

In the second hypothetical, the ALJ asked Williams to assume that the limitations mentioned in the first hypothetical would cause a moderate reduction in concentration, i.e., more often than a mild reduction. (R. at 57.) These limitations would not cause any abandonment of tasks and the individual would be able to continue to complete a full workday. (R. at 57.) Williams indicated that such an individual would be able to perform all of the jobs identified in the response to the first hypothetical. (R. at 57.) Next, in the third hypothetical, the ALJ asked Williams to assume that the individual's alleged problems with depression and headaches would cause a severe reduction in concentration, which would lead to abandonment of tasks. (R. at 57-58.) Williams indicated that such limitations would eliminate the jobs identified in the response to the first hypothetical, and he further indicated that there would be no jobs that such an individual could perform. (R. at 58.) In the final hypothetical, the ALJ asked Williams to assume that the individual would need to recline during the day to rest for more than two hours during a typical eight-hour workday. (R. at 58.) Williams testified that there would be no jobs available for an individual with such limitations. (R. at 58.)

Williams was then questioned by Duncan's counsel. (R. at 58-60.) Duncan's counsel asked if an individual could perform the previously identified jobs if his pain was to the point that it caused distractions and would not allow adequate performance of daily activities of work. (R. at 58.) Williams testified that if the distractions caused him to be unable to be productive during the workday then he would not be able to perform the identified jobs. (R. at 58.) Williams also testified that if the pain caused abandonment of tasks related to daily activities of work, the individual would not be able to be productive during an eight-hour workday. (R. at 59.) Williams indicated that the jobs mentioned did not allow an employee to lie down during scheduled breaks, unless there was some type of lounge, but stated that such an accommodation was not typically provided. (R. at 59.) Williams testified that if Duncan's testimony were accepted as truthful and correct, there would be no jobs in the national economy that he could perform. (R. at 59-60.)

In rendering his decision, the ALJ reviewed records from Smyth County Community Hospital; Dr. Benjamin Scharfstein Jr., M.D.; Heartland Rehabilitative Services; Neuro-Spine Solutions; Wellmont Bristol Regional Medical Center; Dr. Randall Hays, M.D., a state agency physician; Richard J. Milan Jr., Ph.D., a state agency psychologist; UVA Pain Management; Dr. Richard Surrusco, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. William Humphries, M.D.; Cathy Shadden, FNP; Dr. Morgan Lorio, M.D.; Dr. Richard Grube, M.D.; and Mount Rogers Community Services Board. Following the hearing, Duncan's counsel also submitted additional medical records from Mount Rogers

Community Services Board and SE Pain Management to the Appeals Council.[3]

Duncan was treated at Wellmont Bristol Regional Medical Center, ("WBRMC"), from April 12, 2006, to August 8, 2006. (R. at 232-387.) On April 12, 2006, Duncan was involved in an accident in which he fell out of a moving vehicle and was run over. (R. at 354-61.) During the accident, Duncan sustained multiple abrasions and contusions, as well as left foot lacerations and a left hip injury. (R. at 354-61.) While hospitalized, Duncan was prescribed Lortab and Keflex. (R. at 283, 364.) Primary closure of the left hip laceration and closure of the left foot laceration were performed. (R. at 283-84.)

Computerized tomography, ("CT"), scans of the brain, cervical spine, abdomen, knees, left foot and left tibia and fibula all revealed normal or unremarkable findings. (R. at 375-82.) A CT scan of the pelvis showed no pelvic mass or adenopathy, but there was a fracture of the left iliac with evidence of a contusion/hematoma in the internal oblique muscle on the left. (R. at 379.) A CT scan of the left hip showed no signs of fracture or malalignment. (R. at 381.) Puboischial rings were intact, but there was an irregular soft tissue defect over the left iliac wing and a possible avulsion off the anterior aspect of the left iliac wing. (R. at 381.) Duncan was discharged on April 13, 2006, with diagnoses of a fracture of the ilium, a concussion, laceration of the left hip and multiple abrasions. (R. at 283-84.)

_____

[3]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

On April 19, 2006, Duncan returned to WBRMC complaining of left leg and shoulder pain, and he also noted discoloration near his injuries. (R. at 253.) Duncan underwent a lumber myelogram on June 9, 2006, which revealed findings that suggested a very mild L4-L5 disc bulge and no other abnormalities. (R. at 245.) A CT scan of the lumbar spine was essentially normal. (R. at 245-46.) Duncan was treated at WBRMC on August 8, 2006, complaining of pain in the lower extremities and was prescribed Percocet. (R. at 232-41.)

A medical report dated April 21, 2006, by Dr. Benjamin Scharfstein Jr., M.D., indicated that Duncan complained of soreness all over following an accident involving his girlfriend running over him with a vehicle. (R. at 194.) Dr. Scharfstein noted that the soreness was to be expected due to the fair amount of road rash. (R. at 194.) Dr. Scharfstein removed the staples and stitches that were applied following the accident, noting that the wounds were healing reasonably well, but that the injuries "still [had] some ways to go." (R. at 194.) Duncan was prescribed Lortab and advised to see his treating physician to get a refill. (R. at 194.) Dr. Scharfstein noted, "I think [Duncan] is going to be difficult given his long term history of drug abuse." (R. at 194.) Dr. Scharfstein warned Duncan that he would not continue to prescribe pain medication. (R. at 194.)

Duncan presented to the Smyth County emergency room on April 29, 2006, complaining of pain associated with the April 12, 2006, accident. (R. at 195-200.) He reported constant pain in the right leg and foot, as well as the pelvis. (R. at 197.) Upon examination, Duncan was observed to be tender in the pelvic and abdominal areas. (R. at 198.) Duncan was released and prescribed Lortab for pain. (R. at 200.)

Duncan was treated at Heartland Rehabilitation Services from May 1, 2006, to May 8, 2006. (R. at 222-30.) A prescription for therapy dated May 1, 2006, noted that Duncan was to undergo physical therapy two times per week for six weeks. (R. at 229.) At his first therapy session, his short-term goals were to become independent with a home exercise program, improve the left extremity range of motion and reduce his pain by 50 percent. (R. at 230.) Duncan's long-term physical therapy goals were to decrease edema girth by one centimeter, decrease his pain by 80 percent, increase his strength by two grades and increase granulation of tissue by 75 percent. (R. at 230.) Duncan's problems included loss of function, pain, decreased ability to perform activities of daily living and decreased ability to perform work activities. (R. at 230.) His rehabilitation potential was noted as excellent. (R. at 230.) The therapy notes indicate that Duncan's treatment plan consisted of hot pack/cold pack, whirlpool/fluidotherapy, therapeutic exercise, gait training, manual therapy, electronic stimulation unattended, therapeutic activities, neuromuscular re-education and massage therapy. (R. at 227.)

Duncan presented for therapy on May 5, 2006, and reported no new complaints. (R. at 224.) He did express concern regarding running a fever and the wound on his hip. (R. at 224.) Duncan was advised to call his doctor to see if he needed to restart his antibiotics. (R. at 224.) His tolerance to treatment was excellent, which included whirlpool and sterile selective wound debridement for the benefit of dressing changes. (R. at 224.) It was noted that his anterior pelvic wound would be monitored and that his doctor should be contacted if the wound area demonstrated insufficient signs of healing. (R. at 224.) He again presented for therapy on May 8, 2006, and reported that he was feeling better. (R. at 222.) In addition, his range of motion had increased since his previous visit. (R. at 222.)

Duncan's progress toward his goals and his tolerance to treatment were reported to be excellent. (R. at 222.) The treatment regimen and plan remained unchanged. (R. at 222-23.)

Duncan was treated at NeuroSpine Solutions, P.C., from May 1, 2006, to October 6, 2006, by Dr. Morgan Lorio, M.D., and Rebecca Rosemann, P.A. (R. at 410-17.) On May 1, 2006, Duncan presented with a chief complaint of left lower extremity pain. (R. at 416-17.) X-rays of the left lower extremity were negative for any fracture of the ankle. (R. at 416.) Upon physical examination, Duncan's foot was cyanotic and road rash was present on the toes, forefoot and along the Achilles of the left lower extremity. (R. at 416.) This area was quite swollen and tender, and it was cool to touch. (R. at 416.) The dorsalis pedis and posterior tibialis pulses were palpable. (R. at 416.) Duncan was diagnosed with an ASIS fracture of the left pelvic rim, a sacral fracture and a left lower extremity sprain with possible reflex sympathetic dystrophy, ("RSD"), or complex regional pain syndrome, ("CRPS"). (R. at 416.) The treatment plan indicated that Duncan was to report to therapy for whirlpool and desensitization, as well as range of motion of the left ankle. (R. at 416.) Rosemann noted concern based on the vasomotor change of the left lower extremity as compared with the right, especially in the presence of a negative venous doppler showing no injury to artery or vein. (R. at 416.) Duncan was prescribed Percocet and was instructed "to make [the prescription] last for 30 days." (R. at 417.) He also was given a prescription for an air cast to be worn on the ankle for comfort. (R. at 417.)

On May 25, 2006, Dr. Lorio examined Duncan and noted that the accident caused an open fracture to Duncan's ilium that was treated by general surgery with

soft tissue debridement. (R. at 414-15.) Duncan's x-rays were compatible with post traumatic changes and what was appreciated of his sacroiliac joints appeared to be normal. (R. at 414.) The caudal transverse processes at L4 and L5 appeared to be intact, as did those respective vertebral elements. (R. at 414.) Dr. Lorio noted that it was difficult to get a good evaluation or feel for his foot problem. (R. at 414.) Duncan had some purplish discoloration secondary to the crush injury and, given the minimal motion in his foot, he appeared to have incurred some proximal and more probable distal intrinsic nerve and muscle injury. (R. at 414.) His left thigh and calf were smaller than the right side, which indicated atrophy. (R. at 414.) Duncan's patellar reflexes were slightly diminished when compared to the contralateral side, as was his Achilles, which was almost absent on the right side. (R. at 414.) Dr. Lorio suspected a possible plexus injury or sciatic nerve injury that might actually overlay or superimpose upon distal intrinsic peripheral nerve involvement. (R. at 414.) Dr. Lorio indicated that a lumbar myelogram with post CT and nerve conduction study and EMG testing of the left lower extremity would be the best recommendation. (R. at 414.) Additionally, it was noted that Duncan would be referred for consideration for a lumbar epidural or chemical sympathectomy to deal with what could be early CRPS presentation. (R. at 414.) Dr. Lorio opined that Duncan had "a most perplexing problem" and that things were complicated further because Duncan could not afford treatment. (R. at 414.) Dr. Lorio noted that he planned to discuss the potential for a referral to UVA in order to limit Duncan's costs. (R. at 414.) Duncan was prescribed Percocet and physical therapy, and an CT/myelogram of the lumbar spine, nerve conduction studies and EMG tests also were ordered. (R. at 414.)

Duncan returned on June 15, 2006, and it was noted that a post-electrodiagnostic work-up showed increased insertional activity present in the

gastroc, which suggested S1 radiculopathy.  (R. at 413.)  Duncan presented on June 28, 2006, reporting continued leg pain.  (R. at 412.)  The CT/myelogram of the lumbar spine showed a disc bulge at L4-5 and was otherwise relatively unremarkable.  (R. at 412.)  The bulge did not appear to impinge upon the exiting nerve roots at that level.  (R. at 412.)  Upon examination, Rosemann noted that the left foot looked much more normal, as the coloration was normal with less variance throughout the integument.  (R. at 412.)  The swelling had greatly diminished since the previous examination.  (R. at 412.)  Duncan's diagnosis was unchanged.  (R. at 412.)  A lumbar epidural block was ordered and he was prescribed Percocet, but it was noted that the dosage was being reduced.  (R. at 412.)  Duncan again presented on September 11, 2006, with a chief complaint of left foot pain.  (R. at 411.)  He did not undergo a lumbar epidural block because the procedure was too expensive.  (R. at 411.)  Rosemann informed Duncan that they could not prescribe pain medication for a long period of time.  (R. at 411.)  A physical examination showed lessening of vasomotor changes from previous examinations, and Duncan reported that his foot seemed to swell primarily at night.  (R. at 411.)  Roseman indicated that Duncan was to follow up in three months for further evaluation to make sure that he did not "'fall through the cracks.'"  (R. at 411.)  By letter dated October 6, 2006, Dr. Lorio and Rosemann referred Duncan to UVA for pain management.  (R. at 410.)

A medical report dated June 22, 2006, which was completed by Dr. Marta Nagy, M.D., showed that Duncan reported pain in his low back and left leg.  (R. at 490-93.)  He was observed to be somnolent, falling asleep when not stimulated or spoken to, which he claimed was due to the fact that he had not slept the night before.  (R. at 492.)  A motor examination was grossly normal.  (R. at 492.)  Duncan was found to suffer from intervertebral disc disorders, low back pain, lumbar

radiculopathy and a fracture of the pelvis. (R. at 492.) At this visit, an epidural injection was considered, but Dr. Nagy noted that it would be deferred for one week. (R. at 492.)

Dr. Randall Hays, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), on August 28, 2006. (R. at 389-95.) Dr. Hays found that Duncan could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for a total of about six hours in an eight-hour workday and sit for a total of about six hours in an eight-hour workday. (R. at 390.) Dr. Hays determined that Duncan's ability to push and/or pull was unlimited, other than that shown for the ability to lift and/or carry. (R. at 390.) No postural, manipulative, visual or communicative limitations were noted. (R. at 391-92.) Dr. Hays found that Duncan should avoid concentrated exposure to hazards such as machinery and heights. (R. at 392.) Dr. Hays concluded that he anticipated that Duncan would make a satisfactory recovery before the completion of the 12-month duration period for disability. (R. at 395.) Dr. Richard Surrusco, M.D., a state agency physician, reviewed Dr. Hays's PRFC and made identical findings on December 29, 2006. (R. at 429-35.)

On August 31, 2006, Richard J. Milan Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"). (R. at 397-409.) Milan found that Duncan's impairments were not severe and also noted that Duncan suffered from polysubstance dependence disorder, a medical impairment that did not precisely satisfy the diagnostic criteria. (R. at 397, 405.) Hays found no limitations as to Duncan's ability to maintain social functioning, concentration, persistence or

pace, and no episodes of decompensation were noted.  (R. at 407.)  Hays indicated that there was insufficient evidence to evaluate Duncan's restriction of activities of daily living.  (R. at 407.)  On January 3, 2007, Howard S. Leizer, Ph.D., a state agency psychologist, reviewed Milan's PRTF and made identical findings.  (R. at 436-48.)

Duncan was treated at UVA on December 8, 2006, with a chief complaint of left lower extremity pain and numbness.  (R. at 418-26.)  The clinical impression noted left lumbar and left leg pain.  (R. at 420.)  Duncan's methadone prescription was refilled and the dosage was increased.  (R. at 420.)  A doppler study of the left lower extremity was ordered, which revealed findings that both of the lower extremities were within normal limits.  (R. at 420-21.)

Duncan continued treatment at UVA from March 2, 2007, to June 1, 2007.  (R. at 535-69.)  Dr. Robin J. Hamill, M.D., evaluated Duncan on March 2, 2007, due to complaints of left lower extremity pain and numbness.  (R. at 535.)  It was noted that Duncan had some decreased strength in the left lower extremity, partially due to pain with testing.  (R. at 536.)  There were multiple areas of palpable tenderness in the left lower extremity and the extremity was very sensitive.  (R. at 536.)  Positive allodynia was noted and there was some discoloration of the left leg when compared to the right leg.  (R. at 536.)  In addition, there appeared to be a slight temperature decrease from the left leg to the right leg.  (R. at 536.)  Duncan was continued on Lortab and methadone, but it was noted that he would benefit more from an increase in his longer-acting medications and a decrease in the Lortab.  (R. at 536.)  On March 27, 2007, Duncan presented with chief complaints of left lower extremity pain and chronic back pain.  (R. at 544-45.)  He was again prescribed methadone and Lortab.

(R. at 545.)

Duncan underwent a fluoroscopy-guided lumbar epidural steroid injection on June 11, 2007. (R. at 561-62.) Duncan had a pre-procedure pain score of nine out of 10 and a post-procedure pain score of four to five out of 10. (R. at 562.) He was advised to return in two to three weeks for a second series of lumbar epidural steroid injections. (R. at 562.) Duncan returned on June 29, 2007, for the second series and reported a pre-procedure pain score of eight out of 10 and a post-procedure pain score of two. (R. at 555-56.) He was continued on methadone and hydrocodone. (R. at 556.)

On May 1, 2007, Duncan complained of increased lower back pain, as well as shoulder and foot pain. (R. at 541.) He rated his pain as a nine on a 10-point scale and described the pain as both stabbing and aching. (R. at 541.) Duncan reported symptoms such as irritability, depressed mood, insomnia and appetite problems. (R. at 541.) He was diagnosed with chronic pain status post multi-trauma and depression. (R. at 542.) An epidural steroid injection was scheduled, and it was noted that Duncan's MRI demonstrated an annular tear at L4-L5, which could have been part of the pain origination. (R. at 542.) He was given refills for methadone, hydrocodone and Remeron. (R. at 542.)

Dr. William Humphries, M.D., completed a consultative examination dated July 2, 2007, in which Duncan's chief medical conditions were multiple injuries to the left hip and entire left side of his body. (R. at 451-63.) Duncan reported that he had continued to suffer from severe low back pain, as well as pain in the left hip, left thigh and left lower extremity since the April 2006 injury. (R. at 451.) He explained

that his pain was exacerbated by standing or sitting for extended periods, noting that he could not walk 100 feet without having to stop due to discomfort and pain. (R. at 451.) Duncan indicated that he had undergone pain management, including epidural steroid injections and nerve block injections, but stated that the procedures did not provide significant relief. (R. at 451.)

Duncan was observed to be alert, pleasant, cooperative, able to relate and in moderate distress during the examination. (R. at 452.) His range of motion in the neck was moderately reduced due to discomfort in the neck, back and trapezium muscle region, and there was moderate tenderness to palpation of the posterior aspect of the cervical spine and both trapezius muscles. (R. at 452.) Duncan's range of motion in his back was severely reduced due to discomfort in the lower lumbar region and thoracic region with the left side being worse than the right. (R. at 452.) There was no clearcut evidence of kyphosis or scoliosis (spelling), but Dr. Humphries noted that Duncan refused to stand erect and tended to lean in the standing position slightly to the left and in the sitting position he avoided weight bearing on his left gluteal region. (R. at 452.) Dr. Humphries further noted that Duncan refused to stand erect in the lumbar region due to discomfort. (R. at 452.) There appeared to be some paravertebral muscle spasms in the lower lumbar region, primarily on the left side. (R. at 452.) Straight leg raises caused left lower extremity pain and back pain in the sitting position. (R. at 452.) Duncan's joint range of motion in the upper extremities was reduced in both shoulders and both shoulder girdles were tender to palpation, with the left being worse than the right. (R. at 453.) The lower extremity joint range of motion was severely reduced in the left hip and left knee and was mildly reduced in the left ankle. (R. at 453.) The joint range of motion was moderately reduced in the right hip, right knee and right ankle. (R. at 453.) Dr. Humphries noted that there

was some mild synovial thickening of some of the interphalangeal joints of some of the toes in both feet.  (R. at 453.)

Further examination showed that Duncan got on and off the table slowly and sat in a position that allowed him to avoid weight bearing on his left gluteal region. (R. at 453.)  He displayed a 4/5 grip bilaterally and radial median and ulnar nerve functions were intact bilaterally.  (R. at 453.)  Dr. Humphries reported that Duncan's fine manipulations were performed adequately, but were slow on the left side.  (R. at 453.)  His gait was moderately abnormal, and it was noted that he ambulated with the lumbar region flexed to about five to 10 degrees with moderately severe antalgia on the left side.  (R. at 453.)  Duncan was able to briefly toe-stand, but could not heel-stand, heel-walk or toe-walk due to discomfort in the left lower extremity and entire back region.  (R. at 453.)  He was able to bear weight on each leg, but could only do so briefly on the left side.  (R. at 453.)

Dr. Humphries explained that strength in Duncan's lower extremities was difficult to assess because of diffuse pain and give-way, but he noted that there was no significant muscle atrophy.  (R. at 453.)  As such, he found that Duncan's strength was within normal limits in both lower extremities, except for some muscle atrophy and strength loss in the left thigh as compared to the right.  (R. at 453.)  No specific motor or sensory loss of the lower extremities was noted.  (R. at 453.)  A mental status exam showed that Duncan was alert and oriented in all three spheres, he was cooperative, his thought and idea content were within normal limits, his memory was intact and his intelligence was within normal range.  (R. at 454.)  Duncan's affect and grooming were appropriate, and it was determined that he should be able to handle his own funds should benefits be awarded.  (R. at 454.)

Dr. Humphries diagnosed Duncan with multiple mild arthralgias, post-traumatic with probable remote fractures of the pelvis and possibly lower lumbar region, and post-traumatic lumbar strain. (R. at 454.) Dr. Humphries found that Duncan would be able to sit for six hours in a typical eight-hour workday and stand and/or walk for two hours in a typical eight-hour workday with appropriate pain management modalities and orthotics. (R. at 454.) In addition, he found that Duncan could only occasionally stoop, kneel and crouch, and he could not climb or crawl at the time of the examination. (R. at 454.) Dr. Humphries found that Duncan should avoid heights and hazards and that there would be no fume restriction. (R. at 454.)

Included in the report was a Medical Source Statement Of Ability To Do Work-Related Activities (Physical) dated June 26, 2007, which also was completed by Dr. Humphries. (R. at 457-63.) Dr. Humphries determined that Duncan could frequently lift and/or carry items weighing up to 10 pounds, occasionally lift and/or carry items weighing up to 20 pounds, sit for a total of six hours in a typical eight-hour workday, two hours of which without interruption and stand and/or walk for a total of two hours in a typical eight-hour workday, one hour of which without interruption. (R. at 458.) He noted that Duncan did not require the use of a cane to ambulate. (R. at 458.) Dr. Humphries found that Duncan could frequently use either hand to reach, handle, finger, feel and push/pull. (R. at 459.) He also found that Duncan could occasionally use both feet for the operation of foot controls and that he could occasionally climb ladders or scaffolds, stoop, kneel and crouch; however, he determined that, at the time of the evaluation, Duncan could not crawl or climb stairs or ramps. (R. at 459-60.) Dr. Humphries indicated that Duncan could tolerate frequent exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants and loud noise, occasional exposure extreme cold and heat and in operating vehicles and

that he could not be exposed to unprotected heights, moving mechanical parts or vibrations. (R. at 461.) He also determined that Duncan could shop, travel without a companion for assistance, ambulate without an assistance device, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed himself, care for personal hygiene and sort, handle and use paper/files. (R. at 462.) Lastly, Dr. Humphries noted that Duncan's limitations have lasted or would last for 12 consecutive months. (R. at 462.)

Duncan was treated by Dr. Richard Grube, M.D., from August 29, 2007, to September 12, 2007. (R. at 467-89.) During these visits, Duncan reported low back pain and symptoms of myalgias and arthralgias. (R. at 467-70.) He was diagnosed with a nerve injury not otherwise specified, herniated disc syndrome, eczema craquele and low back pain. (R. at 467-70.) He was prescribed Lortab and Mirapex. (R. at 467-70.) However, on September 20, 2007, Dr. Grube discontinued Duncan's pain management when a urine screen showed that there was no Lortab in his system. (R. at 475.)

Duncan was treated by Dr. William Powers, M.D., and Cathy Shadden, FNP, from October 25, 2007, to January 10, 2008. (R. at 494-501.) On October 25, 2007, Duncan reported back and leg pain. (R. at 498.) Dr. Powers informed Duncan that he would look at his medical history and determine whether or not he would take the case. (R. at 498.) On November 11, 2007, Duncan complained of left side pain and it was noted that such pain could be a late effect of fractures to the lower extremities. (R. at 500.) Dr. Powers noted that he had a "frank discussion" with Duncan, in which he expressed concerns about Duncan's drug use. (R. at 500.) Dr. Powers refused to

take his case.  (R. at 500.)

Duncan presented to Cathy Shadden, FNP, on December 14, 2007, for a follow-up appointment regarding left leg and lower back pain.  (R. at 496-97.) Duncan rated his pain as a six on a ten-point scale.  (R. at 496.)  The clinical assessment noted pain in the left limb and back pain, and Duncan was advised to continue taking Lortab, penicillin and potassium.  (R. at 497.)  Duncan presented again on January 10, 2008, with complaints of back and leg pain.  (R. at 494-95.)  The assessment noted backaches, back pain and pain in the left limb.  (R. at 495.)  He was prescribed Ultram and Flexeril, and he was advised to follow up in two months.  (R. at 495.)

In a medical report dated February 14, 2008, completed by Dr. Dennis Aquirre, M.D., Duncan's chief complaints were neck pain that radiated down his back and low back pain that radiated down his left hip and leg down to the left foot, all of which were related to his April 2006 accident.  (R. at 464-66.)  Duncan described his pain as aching, sharp and stabbing, noting that the usual pain level rated as a nine on a 10-point scale.  (R. at 464.)  He reported that his functional impairments were severe, explaining that the pain rendered him unable to carry out his daily activities and caused sleep difficulties.  (R. at 464.)  Duncan was diagnosed with disorders of the autonomic nervous system, specifically RSD of the lower limb that was uncontrolled and unstable.  (R. at 466.)  The clinical impression noted multiple lacerations and contusions with repair, fractured left iliac crest, CRPS type II in the left lower extremity, tobacco use, a history of drug abuse and indigent.  (R. at 466.)  Dr. Aquirre recommended a neuropsychological evaluation and aggressive modalities of the left foot.  (R. at 466.)  Dr. Aquirre saw Duncan again on March 14, 2008, again noting

RSD of the lower limb.  (R. at 592-94.)

Duncan received treatment at Mount Rogers Community Service Board from November 11, 2007, to March 27, 2008, by Dwight Miller, LCL.  (R. at 502-34, 581-88.)  A clinical assessment form indicated that Duncan's presenting problems and psychosocial stressors included medical issues, limited resources, isolation, substance abuse, domestic violence, abuse, support systems, relationships and a history of non-compliance with treatment.  (R. at 502.)  Duncan reported that he experienced pain on the entire left side of his body.  (R. at 502.)  According to Duncan, during the April 2006 car accident, his injuries were caused by a jump from a vehicle in which he intended to kill himself.  (R. at 502.)  Although he denied any suicidal ideations at the time of the evaluation, he indicated that he had tried to overdose on Xanax in the past.  (R. at 502.)  Duncan was diagnosed with recurrent major depressive disorder with psychotic features, panic disorder with agoraphobia, polysubstance dependence in early remission, chronic pain, limited primary support and financial stressors.  (R. at 508.)   In addition, it was indicated that Duncan had a then-current Global Assessment of Functioning, ("GAF"), score of 55,[4] which also was the highest GAF score Duncan had exhibited within the year prior to the evaluation.  (R. at 508.)  Miller recommended counseling and adult mental health case management.  (R. at 509.)   During this course of treatment, Duncan routinely missed scheduled appointments.  (R. at 512-13, 515-24.)

---

[4]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning . . . ."  DSM-IV at 32.

On January 7, 2008, Duncan reported that he was doing fairly well, but explained that he continued to experience some anxiety. (R. at 581.) Duncan returned on February 6, 2008, and reported chronic pain and described that he had difficulty making others understand that his problems were not related to his past substance abuse. (R. at 583.) His appearance, behavior and thought processes were unremarkable, and he was found to have poor impulse control, low energy and to be withdrawn. (R. at 583.) Duncan's mood/affect was irritable, and it was noted that he had a history of suicide attempts, medical problems and chronic pain. (R. at 583.) He also reported social anxiety, which he speculated could have been caused by his relationship with his father. (R. at 583.) On March 27, 2008, Duncan stated that he was doing well. (R. at 588.) He was observed to be well-groomed, cooperative, oriented in all spheres and his mood/affect was appropriate. (R. at 588.) Miller recommended supportive counseling and monitoring. (R. at 588.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 15, 2008, the ALJ denied Duncan's claims. (R. at 16-30.) The ALJ found that Duncan met the insured status requirements of the Act through March 31, 2010. (R. at 18.) The ALJ also found that Duncan had not engaged in substantial gainful activity since April 12, 2006, the alleged onset of disability date. (R. at 18.) The ALJ determined that the medical evidence established that Duncan suffered from severe impairments, namely status post ASIS fracture of the left pelvic rim, sacral fracture and depression. (R. at 18.) However, he found that Duncan did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) The ALJ found that Duncan retained the residual functional capacity to perform sedentary work, i.e., work generally performed sitting that does not require lifting in excess of 10 pounds. (R. at 25.) The ALJ specifically noted Duncan's back pain, leg pain, left arm pain, headaches and depression, and explained that Duncan took medication that could impact his ability to stay on task and could cause drowsiness. (R. at 25.) That said, the ALJ found that "[a]ny combination of these would cause moderate reduction in concentration, occur more often than mild,

several times an hour[], 2 or 3 seconds in which he would reflect on one of these problems, but would not cause abandonment of task and he could continue on and complete a full workday." (R. at 25.) As such, the ALJ determined that Duncan was unable to perform his past relevant work. (R. at 28.) Based on Duncan's age, education, work experience and residual functional capacity, the ALJ found that there were jobs existing in significant numbers in the national economy that Duncan could perform, including jobs as an order clerk, a charge account clerk and an office clerk/addresser. (R. at 28-29.) Thus, the ALJ concluded that Duncan was not under a disability as defined in the Act and was not entitled to benefits. (R. at 29-30.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2009).

Duncan argues that the ALJ's decision is not supported by substantial evidence of record. (Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-12.) Duncan contends that the ALJ erred by failing to analyze the cumulative effect of all of Duncan's medical problems and impairments on his ability to work. (Plaintiff's Brief at 10-11.) Duncan also argues that the ALJ erroneously used his activities of daily living as a basis for a not disabled finding. (Plaintiff's Brief at 11.) Duncan asserts that the ALJ further erred by rejecting other hypothetical questions posed to the vocational expert during the hearing, particularly the hypothetical questions that included Duncan's alleged depression. (Plaintiff's Brief at 11-12.) Lastly, Duncan argues that the case should be remanded because he has submitted evidence that is new and material to this proceeding that relates to the period on or before the date of the ALJ's decision. (Plaintiff's Brief at 12.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The

court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Duncan's argument that the ALJ failed to analyze the cumulative effect of Duncan's medical problems. (Plaintiff's Brief at 10-11.) In particular, Duncan claims that the ALJ erred by discounting Duncan's allegations of depression. (Plaintiff's Brief at 10.) After a review of the record, I disagree.

The court recognizes that the United States Court of Appeals for the Fourth Circuit has stated "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect,

taken together, is to render [the] claimant unable to engage in substantial gainful activity . . . . [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). In order to determine "whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments." *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) (per curiam) (citing *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985)). Additionally, the ALJ must adequately explain his or her evaluation of the combined effect of impairments. *See Reichenbach*, 808 F.2d at 312. "This rule merely elaborates upon the general requirement that a ALJ is required to explicitly indicate the weight given to relevant evidence." *Hines*, 872 F.2d at 59 (citing *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987)).

In this case, despite Duncan's contention that the ALJ discounted the allegations of depression, the court notes that the ALJ found that Duncan suffered from severe impairments, including status post ASIS fracture of the left pelvic rim, sacral fracture and, most notably, depression. (R. at 18.) For more than five written pages in the ALJ's opinion, he discussed the relevant medical evidence of record, including records of mental health treatment at Mount Rogers. (R. at 18-24.) Moreover, in concluding that Duncan did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, the ALJ thoroughly discussed his reasoning, particularly as to Duncan's mental impairments. (R. at 24-25.) In setting forth his residual functional capacity finding, the ALJ again recognized that Duncan suffered from depression. (R. at 25.) The ALJ accounted for such an impairment by noting that his medication could impact his ability to stay on task and could cause

drowsiness, and he noted that this could result in a moderate reduction in the ability to concentrate. (R. at 25.) He opined that such problems would occur more often than mild, several times per hour for to two to three seconds, in which he would reflect on the problems, but the problems would not cause abandonment of task, allowing Duncan to continue and complete a full workday. (R. at 25.) Thus, not only did the ALJ recognize that Duncan suffered from depression, but he also accounted for restrictions caused by his alleged mental impairments. (R. at 25.)

Furthermore, the ALJ's findings as to Duncan's mental limitations were supported by the opinions and findings of the state agency psychologists. (R. at 397-409, 436-48.) On August 31, 2006, Milan completed a PRTF, finding that Duncan's impairments were not severe, and he also noted that Duncan suffered from polysubstance dependence disorder, a medical impairment that did not precisely satisfy the diagnostic criteria. (R. at 397, 405.) Hays found no limitations as to Duncan's ability to maintain social functioning, concentration, persistance or pace, and no episodes of decompensation were noted. (R. at 407.) Hays indicated that there was insufficient evidence to evaluate Duncan's restriction of activities of daily living. (R. at 407.) On January 3, 2007, Leizer reviewed Milan's PRTF and made identical findings. (R. at 436-48.) Therefore, the court finds that the ALJ's findings with respect to Duncan's mental impairments are supported by substantial evidence of record. Additionally, the court notes that a review of the ALJ's findings clearly demonstrates that he considered and analyzed all of the relevant evidence and sufficiently explained his findings and rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. As such, the court finds that the ALJ did not fail to analyze the cumulative effect of Duncan's medical problems and did not discount Duncan's claims of depression. Instead, the ALJ took into consideration all

medical evidence of record, including allegations of depression and mental health treatment records, and made findings consistent with other medical evidence of record.

Next, Duncan argues that the ALJ erred by using Duncan's activities of daily living as a basis for finding that he was not disabled. (Plaintiff's Brief at 11.) This argument is without merit. The ALJ properly considered these activities, as is permitted by the Regulations. *See* 20 C.F.R. §§ 404.1529, 416.929 (2009). Also, as noted by the Commissioner, such activities are a part of the consideration of one's mental impairments, in that the court must examine how an individual's mental impairments impact their daily lives. In this case, the ALJ did not base his entire disability finding on Duncan's activities of daily living; instead, he simply considered those activities as part of his overall evaluation of Duncan's ability to work. Thus, I am of the opinion that the ALJ's discussion of Duncan's activities of daily living was proper, as such consideration is necessary in determining how an individual's impairments may or may not impact their ability to perform and complete routine daily activities.

Duncan also argues that the ALJ erred in rejecting other hypothetical questions posed to the vocational expert, claiming that the questions were not supported by substantial evidence. (Plaintiff's Brief at 11-12.) Duncan claims that the vocational expert's response to certain questions, such as the third hypothetical, should have been relied upon because that particular hypothetical properly represented the severity of Duncan's depression. (Plaintiff's Brief at 11-12.)

It is well-settled that the testimony of a vocational expert constitutes substantial

evidence for purposes of judicial review where his or her opinion is based upon a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of a claimant's impairments. *Walker*, 889 F.2d at 50. The determination of whether a hypothetical question fairly sets out all of a claimant's impairments turns on two important issues: (1) whether the ALJ's finding as to the claimant's residual functional capacity is support by substantial evidence; and (2) whether the hypothetical adequately set forth the residual functional capacity as found by the ALJ. *See generally Walker*, 889 F.2d at 50.

Here, Duncan specifically challenges the ALJ's rejection of an answer to a hypothetical question posed at the hearing. In the third hypothetical, the ALJ asked Williams to assume that the individual's alleged problems with depression and headaches would cause a severe reduction in concentration, which would lead to abandonment of tasks. (R. at 57-58.) Williams indicated that such limitations would eliminate the jobs identified in the response to the first hypothetical, and he further indicated that there would be no jobs that such an individual could perform. (R. at 58.) Williams's answer to this hypothetical certainly shows that, if Duncan's allegations are true, his problems with depression would prohibit him from working. However, as discussed above, in rendering his decision, the ALJ considered Duncan's claims of depression, as well as the mental health treatment he received. The ALJ gave Duncan the benefit of the doubt and found that his depression was severe; however, the ALJ did not find that Duncan's depression, in combination with the other identified severe impairments, met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. As previously discussed, the ALJ thoroughly explained his reasoning and analyzed all the relevant evidence. In rendering his decision that Duncan could perform sedentary work, he recognized

Duncan's problems with depression and even accounted for certain mental limitations in his residual functional capacity finding. (R. at 25.) Morever, the state agency opinions of record supported the ALJ's findings.

Therefore, the critical inquiry is whether the ALJ was justified in accepting the vocational expert response to the second hypothetical. In that hypothetical, the ALJ asked Williams to assume that the limitations mentioned in the first hypothetical would cause a moderate reduction in concentration, i.e., more often than a mild reduction. (R. at 57.) These limitations would not cause any abandonment of tasks and the individual would be able to continue to complete a full workday. (R. at 57.) Williams indicated that such an individual would be able to perform all of the jobs identified in the response to the first hypothetical. (R. at 57.) This hypothetical question, and the response thereto, falls directly in line with the ALJ's residual functional capacity finding. In fact, this hypothetical accounts for certain limitations as to Duncan's depression and mental impairments. Thus, for the reasons stated above, the court finds that the ALJ properly rejected the third hypothetical and was justified in accepting the vocational expert's response to the second hypothetical because the question and response were both supported by substantial evidence and the hypothetical adequately set forth the residual functional capacity as found by the ALJ. *See Walker*, 889 F.2d at 50.

Lastly, Duncan argues that the case should be remanded because he submitted new and material evidence following the hearing that relates to the period on or before the ALJ's decision. (Plaintiff's Brief at 12.) Duncan contends that such evidence could lead to a different decision in this claim for disability. (Plaintiff's Brief at 12.) I disagree.

In this case, after the ALJ hearing, Duncan's counsel submitted additional records to the Appeals Council. The Appeals Council found no reason under the rules to review the ALJ's decision; thus, the ALJ's decision was affirmed and Duncan's request for review was denied. (R. at 6-9.) The Appeals Council explained that it considered all the additional evidence presented, including records dated *after* the ALJ's decision. (R. at 6-7.) Specifically, the Appeals Council explained that it considered the records dated April 17, 2008, to December 11, 2008, from SE Pain Management and records dated April 23, 2008, to June 24, 2008, from Mount Rogers Community Services Board. (R. at 7.) However, the Appeals Council determined that the information as a whole did "not provide a basis for changing the [ALJ's] decision" and further explained that the additional evidence dated subsequent to the ALJ's decision was not relevant to the determination of disability prior to the date of the decision. (R. at 7.)

Pursuant to 42 U.S.C. § 405(g) sentence six,

> [this] court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

According to the Supreme Court, "[t]he sixth sentence of § 405(g) plainly describes an entirely different kind of remand [than the fourth sentence], appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990); *see also Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). Thus, in order for the court to properly grant a

remand under sentence six of § 405(g), the additional evidence must be new, material and relate to the period on or before the date of the ALJ's decision. *See Wilkins v. Secretary of Dep't of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991). For the purposes of the this analysis, evidence is considered new "if it is not duplicative or cumulative." *See Wilkins*, 953 F.2d at 96. Furthermore, as stated in *Wilkins*, "[e]vidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." 953 F.2d at 96; *see also Borders v. Heckler*, 777 F.2d 954, 956 (4th Cir. 1985).

It is also imperative that good cause be shown for the failure to incorporate the new evidence into the record in a prior proceeding. Various courts have interpreted the "prior proceeding" language to include the ALJ stage of review, as well as the Appeals Council stage of review. *See Edwards v. Astrue*, 2008 U.S. Dist. LEXIS 13625, *23 (W.D. Va. February 20, 2008) ("Sentence six applies specifically to evidence not incorporated into the record by either the ALJ or the Appeals Council."); *see also Ingram v. Astrue*, 496 F.3d 1253, 1269 (11th Cir. 2007) ("'[T]he question [under the sixth sentence] is not whether there is good cause for failure to present the evidence at the ALJ level, but rather for failure to present it at the administrative level, which includes the Appeals Council stage.'") (quoting *White v. Barnhart*, 373 F. Supp. 2d 1258, 1265 (N.D. Ala. 2005)).

Here, without addressing whether the additional evidence was new, material and related to the relevant time period, it is clear that a portion of the additional evidence presented to the Appeals Council was incorporated into the record. As such, this court is not permitted to remand pursuant to sentence six because the evidence was properly made a part of the record by the Appeals Council. *See Edwards*, 2008 U.S. Dist.

LEXIS at *23; *Ingram*, 496 F.3d at 1269; *see also Nelson v. Sullivan*, 966 F.2d 363, 366 n.5 (8th Cir. 1992) ("[O]nce the evidence is submitted to the Appeals Council it becomes part of the record, thus it would not make sense to require [the claimant] to present good cause for failing to make it part of a prior proceeding's record.") Thus, the court finds that, with regard to the additional evidence dated during the relevant time period, remand is inappropriate.

Also, the court recognizes that the Appeals Council refused to incorporate certain evidence into the record that was presented by Duncan's counsel. (R. at 7.) The Appeals Council explained that the records dated subsequent to the ALJ's decision were not material to the issue of whether Duncan was disabled on or before April 15, 2008, the date of the ALJ's decision. (R. at 7.) After reviewing the Appeals Council's explanation, I agree that the records were not material in determining whether Duncan was disabled on or before April 15, 2008. According to the regulations,

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ] hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the [ALJ] hearing decision.

*See* 20 C.F.R. §§ 404.970(b), 416.1470(b) (2009). Additionally, the regulations explain that,

> The Appeals Council will consider all the evidence in the [ALJ] hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the [ALJ] hearing decision.

> If [the claimant] submit[s] evidence which does not relate to the period on or before the date of the [ALJ] hearing decision, the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and will advise [the claimant] of [the] right to file a new application.

*See* 20 C.F.R. §§ 404.976(b)(1), 416.1476(b)(1) (2009).

Accordingly, because these particular records submitted by Duncan were not related to the time period on or before the ALJ's decision, the Appeals Council properly declined to incorporate the evidence into the record. Duncan claims that the ALJ erred by disregarding these additional records. However, because the records were not relevant to the time period on or before the ALJ's decision and were refused by the Appeals Council, Duncan's remaining remedy for consideration of such records would be to file a new application for benefits, alleging disability after April 15, 2008, which he was properly advised to do by the Appeals Council. *See* 20 C.F.R. §§ 404.976(b)(1), 416.1476(b)(1); *see generally* 20 C.F.R. §§ 404.620(a)(2), 416.330(b). The court further notes that, not only were the records dated after the relevant time period, but the additional records were essentially repetitive, adding nothing new or significant to the court's consideration, and any consideration of such records would not have led to a different outcome.

## IV. Conclusion

For the foregoing reasons, I will sustain the Commissioner's motion for summary judgment and overrule Duncan's motion for summary judgment. The Commissioner's decision denying benefits will be affirmed.

An appropriate judgment will be entered.

ENTER: February 26, 2010

/s/ James P. Jones
Chief United States District Judge